IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANTWAIN PORTER,                )
                               )
            Plaintiff,         )
                               )
      v.                       )            1:24CV550
                               )
ALFRED ALONZO SCOTT, JR.,      )
                               )
            Defendant.         )

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

In this civil rights cause of action, Antwain Porter alleges that Alfred Alonzo Scott, Jr. used excessive force against him when he was a pre-trial detainee in the Forsyth County Law Enforcement and Detention Center ("FCLEDC"). The parties have conducted discovery and this matter is before the Court on Scott's motion for summary judgment. Docket Entry 25. Because there is no genuine dispute about any material fact, and those uncontroverted facts demonstrate Scott did not use excessive force in the incident at issue, the Court should grant Scott's motion.

## I.    FAILURE TO RESPOND

Upon Scott's filing of the instant motion for summary judgment, the Clerk mailed Porter the standard Roseboro letter informing him of the motion and his right to respond. The letter warned Porter that if he failed to respond to the motion, the Court may "conclude that the defendant['s] contentions are undisputed" and grant judgment in favor of Scott. Docket Entry 30. *See also* M.D.N.C. Civ. L.R. 7.3(k) ("If no response brief is filed within the time required by this rule, the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice."). Despite the Court's warning, Porter has not responded to the motion,[1] nor did he verify the factual allegations in his Complaint, *see* Docket Entry 2, such that they could be considered as more than mere allegations, *see Gowen v.*

---

[1] There is also no entry on the docket of the Roseboro letter being returned as undeliverable. Therefore, it is presumed that Porter received it.

*Winfield*, 130 F.4th 162, 175-76 (4th Cir. 2025).

Nevertheless, the Court cannot summarily grant Scott's motion because Porter's failure to respond "does not fulfill the burdens imposed on moving parties by Rule 56 [of the Federal Rules of Civil Procedure]." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). "Rule 56 requires that the moving party establish, in addition to the absence of a dispute over any material fact, that it is 'entitled to a judgment as a matter of law.'" *Id.* Thus, although Porter's failure to respond may leave Scott's facts uncontroverted, Scott "must still show that the uncontroverted facts entitle [him] to 'a judgment as a matter of law.'" *Id. See also Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55-56 (4th Cir. 1994) (noting that, even if the absence of a response, "the court should look at the movant's own papers . . . [and] determine if the record of filed depositions, answers to interrogatories, admissions, and affidavits[] demonstrates that a genuine issue exists as to any material fact").

## II.    FACTS

Porter alleges that in 2022 when he was a pre-trial detainee in the eighth floor C pod, Scott went inside his cell,

took things, and then followed Porter, calling him names. Compl. § IV.D. Scott then allegedly charged Porter, held him down on the table, punched him over five times in the face and head, and then slammed him to the ground, all while Porter was handcuffed. *Id.* Porter claims he suffered a swollen temple, bruised jaw, and bruised face. Compl. § V. He filed this action pursuant to 42 U.S.C. § 1983 claiming that Scott used excessive force.

In support of summary judgment, Scott, a detention officer at FCLEDC at all relevant times, submitted his own affidavit. *See* Alfred Alonzo Scott, Jr. Affidavit (Sept. 25, 2025), Docket Entry 26. He avers that, on August 17, 2022, he was assigned to the 8C and 8D Housing Units, each of which has two levels that are connected by two flights of stairs. *Id.* ¶ 5. Inmates with special needs were housed in the 8 Housing Unit ("8 South"). *Id.* "8 South is separate from the general population and houses inmates in administrative segregation, disciplinary segregation, direct deposits, and those with behavior problems and/or mental deficiencies, or inmates in protective custody."[2] *Id.*

Porter was housed in 8 South "after being formally disciplined for 1) threatening a staff member, 2) being

---

[2] In his Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Mem. in Supp."), Scott uses these categories as examples of detainees with "special needs," but it is unclear from his affidavit whether they are

examples of detainees with special needs or whether the term special needs has its own meaning. *Compare* Mem. in Supp. at 2-3, Docket Entry 28 *with* Scott Aff. ¶ 5, Docket Entry 26.

in an unauthorized area, and 3) interfering or preventing a staff member from performing official duties." *Id.* (citing Scott Aff. Ex. 2, Disciplinary Hearing for Inmate (July 7, 2022)).[3]

At approximately 8:30 p.m., while conducting his security round, Scott "noticed that Porter's cell contained numerous used disposable food trays and cups, and at least one of the trays had Porter's feces in it," *id.* ¶ 6, despite there being a toilet in each cell, *id.* n.2. FCLEDC used disposable food products in 8 South for the safety of inmates and others, and, when an inmate worker came to collect the trash from each cell three times a day, the inmate was supposed to provide his trash through his cell's food pass door. *Id.* Inmates were not allowed to hoard used food trays or cups in their cells for sanitary and safety reasons. *Id.*

FCLEDC video footage from inside Porter's two-story dorm in 8 South captured what follows but without audio. *See* Scott Aff. Ex. 1.[4] After Scott saw the trays in Porter's cell, he entered the room while Scott was on his mandatory one hour outside his cell. Scott Aff. ¶ 7. Scott began discarding the trash onto the floor below. *Id.* But "[o]nce [he] entered Porter's cell, [Porter] rushed back towards [Scott] and said he 'would spit on [Scott] and beat [his] ass if [he] entered [Porter's] room again.'" *Id.* (citing Ex. 1, Clip 2). Scott ignored the comment and continued his security rounds "while Porter stood by his cell and continued to make threats." *Id.* (citing Ex. 1, Clip 2). "When [Scott] began walking down the stairs, Porter followed [him] and

---

[3] Both in his affidavit and Memorandum in Support, Scott states that, "[a]part from his disciplinary actions, Porter was also in 8 South because he was under a SAM's [Special Administrative Measures] Order for continually threatening staff" and, when out of his cell, was required to be fully restrained and with no other detainees. Scott Aff. ¶ 5. *See also* Mem. in Supp. at 4 n.6. In support of that statement, Scott cites Exhibit 3 to his affidavit. Exhibit 3 is, indeed, a SAMs form for Porter. But it is dated July 2, 2023, nearly one year after the incident at the heart of this lawsuit. Exhibit 3 does not provide support for this additional reason Porter was in 8 South.

[4] Exhibit 1 is a compact disc with three unedited clips of FCLEDC security camera footage from different points of view depicting the "August 17, 2022 use-of-force incident." Scott Aff. ¶ 4. Scott is familiar with FCLEDC records and knows they "were created and compiled in the regular practice, and in the regular course of business, at the FCLEDC, by persons with knowledge of such events and transactions made at the time such events and transactions occurred." *Id.* ¶ 4. In addition, detention officer and Special Response Team member Jemar Russell "reviewed these recordings and they fairly and accurately depict the August 17, 2022 use-of-force incident." Jemar Russell Aff. ¶ 3 (Sept. 28, 2025), Docket Entry 27.

3

continued making threats. *Id.* (citing Ex. 1, Clip 2).

Scott reached the first floor and "kicked the food trays into a pile" and tried to leave the 8C dorm. *Id.* ¶ 8 (citing Ex. 1, Clip 1). Because the control room officer would only open the door if an inmate were behind the red line, he did not open the door for Scott to leave because Porter was inside the red line. *Id.* (citing Ex. 1, Clip 1). Porter then spit on Scott. *Id.* (citing Ex. 1, Clip 1).

Afterwards, Scott "went to grab Porter's jump suit [sic] to forcefully restrain him so he could be served with a disciplinary infraction and be charged with malicious conduct by a prisoner." *Id.* (citing Ex. 1, Clip 3).

But Scott's "attempt to grab [Porter's] jumpsuit was unsuccessful, and [Porter] struck [Scott] in the face," *id.* (citing Ex. 1, Clip 3), while handcuffed, *see id.* Ex. 1, Clip 3. Scott "then re-engaged and grabbed Porter's jumpsuit and attempted to secure him against the housing unit's officer desk." *Id.* (citing Ex. 1, Clip 3). Scott "tried to keep him on the desk, but he continued to resist and fight so [Scott] struck him multiple times and told him to stop resisting." *Id.* (citing Ex. 1, Clip 3).

"Once Porter stopped resisting and fighting, [Scott] stopped striking him and took him to the floor." *Id.* (citing Ex. 1, Clip 3). The Special Response Team ("SRT"), "a group of specially trained detention officers that respond to and contain emergencies and/or potentially high-risk situations within the FCLEDC," *id.* n.4, responded and "secured Porter," *id.* (citing Ex. 1, Clip 3).

Jemar Russell, a detention officer at the Forsyth County Sheriff's Office at the time, was one of the SRT members who responded. Jemar Russell Aff. ¶¶ 2, 4 (Sept. 28, 2025), Docket Entry 27. When he arrived, he saw Scott and another detention officer "were subduing" Porter behind the unit officer's desk. *Id.* ¶ 4. Russell switched positions with Scott who then "removed himself from the scene." *Id.* ¶¶ 4, 5. Russell and the other officer helped Porter to his feet and sat him on the table. *Id.* ¶ 5. Russell "saw a small abrasion of Porter's hand, but did not see any other injuries." *Id.* The EMT who assessed Porter for injuries did not recommend treatment or a hospital visit. *Id.*

Russell and other SRT members took Porter back to his cell. *Id.* ¶ 6. When they reached the second floor, "Porter spit in the direction of Captain Loveland and Lt. Kivette." *Id.* (citing Ex. 1 to Scott Aff., Clip 2). "Other detention officers ran up the stairs and [they] drove Porter to the back of his cell" where they "placed him on the floor on top of a mattress." *Id.* He "continued resisting and crawled under a desk." *Id.* They "pulled Porter from under the desk as he continued resisting and eventually placed him on his stomach" to remove his handcuffs before they left. *Id.* He stopped resisting but then spit at the

4

deputy trying to remove his handcuffs. *Id.*

Once they had removed Porter's handcuffs, they had him remain on his stomach with his hands behind his back as they exited. *Id.* Russell unholstered his taser and ordered Porter to stay where he was until Russell told him otherwise "so that everyone could exit the cell safely." *Id.* Porter complied without Russell deploying his taser. *Id.*

A paramedic also assessed Scott for injuries because Porter struck him in the head with handcuffs. Scott Aff. ¶ 9. He was taken to the hospital for further evaluation for concussion, but he did not have a concussion or any other injuries. *Id.*

## III. STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023). The moving party bears the burden of establishing the absence of a genuine

dispute of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56).

A party cannot rely on statements in a brief to support a motion for summary judgment, because they are not evidence. *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 15-CV-559, 2017 WL 11488724, at *1 n.4 (M.D.N.C. Jan. 26, 2017) (collecting cases); *see also Hill v. Carvana, LLC*, No. 22-CV-37, 2022 WL 1625020, at *3 (M.D.N.C. May 23, 2022).

"An affidavit or declaration used to support [summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

In addition, "even an unchallenged video must be taken in the light most favorable to [the non-moving party] . . . if it does not blatantly contradict his account of the facts." *Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir.

2024) (citing *Scott v. Harris*, 550 U.S. 372, 378-80 (2007)).

## IV. DISCUSSION

Title 42, United States Code, Section 1983 "is a federal statutory remedy available to those deprived of rights secured to them by the Constitution and, in a more sharply limited way, the statutory laws of the United States" by persons acting under color of state law. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). A plaintiff bringing suit pursuant to Section 1983 must show that a person acting under color of state law violated a Constitutional or other federal legal right. *West v. Atkins*, 487 U.S. 42, 48 (1988).

Here, the Constitutional right at issue is the right to be free from an officer's use of excessive force, a right provided to a pre-trial detainee in the Due Process Clause of the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015); *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989). "'[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Kingsley*, 576 U.S. at 397-98 (quoting *Graham*, 490 U.S. at 395 n.10).

To succeed on a claim of excessive force as a pre-trial detainee, the plaintiff must show that "'the force purposely or knowingly used against him was objectively unreasonable.'"

*Simmons*, 106 F.4th at 387 (quoting *Kingsley*, 576 U.S. at 396-97).

"[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (quoting *Graham*, 490 U.S. at 396). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time . . . ." *Id.* (citing *Graham*, 490 U.S. at 396).

In so doing, the court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

As the *Kingsley* Court acknowledged, "[r]unning a prison is an inordinately difficult undertaking," where "safety and order . . . requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* at 399 (internal quotations omitted). "Officers facing disturbances 'are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (quoting *Graham*, 490 U.S. at 397).

Thus, "a court must judge the reasonableness of the force used from

6

the perspective and with the knowledge of the defendant officer." *Id.* And, in so doing, a court must review the force used in "full context" to avoid "miss[ing] the forest for the trees." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015).

The United States Supreme Court recently reiterated that "the totality of circumstances inquiry into a use of force has no time limit." *Barnes v. Felix*, 605 U.S. 73, 80 (2025). While "the situation at the precise time of the [use of force] will often be what matters most, . . . earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.*

To determine the reasonableness of an officer's actions, courts assess "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," among other circumstances. *Kingsley*, 576 U.S. at 397 (citing *Graham*, 490 U.S. at 396).

A. The relationship between the need for the use of force and the amount of force used.

Here, after Porter spit on Scott, Scott tried to grab Porter's jumpsuit to detain and charge him for malicious conduct. Missing Porter's jumpsuit

allowed Porter the time to strike Scott. Scott was then able to hold on to Porter's jumpsuit and ordered him to comply. The two men stayed upright as Scott tried pushing Porter towards the nearby empty desk, all the while telling Porter to stop resisting. Once they reached the desk, Porter continued to resist and fight. It was only at this point that Scott struck Porter. He continued striking Porter multiple times but only until Porter finally complied with Scott's repeated orders to stop resisting. In other words, only after Porter assaulted Scott and thereafter refused to comply with Scott's orders did Scott strike Porter multiple times. And he stopped doing so once Porter stopped resisting.

B. The effort made by the officer to temper or limit the amount of force.

Next, from the beginning of his interaction with Porter, Scott attempted to limit the amount of force he used. He ignored Porter's repeated threats, including his threat to beat Scott's "ass," continued his security rounds, and proceeded towards the exit. After Porter spit on Scott, Scott tried to grab Porter's jumpsuit to gain control of him. Even after Porter struck Scott, Scott held on to Porter's jumpsuit, and the two remained on their feet as Scott repeatedly ordered Porter to stop resisting. Only when they arrived at the empty desk and Porter fought and continued resisting did Scott strike Porter. And he

Case 1:24-cv-00550-CCE-JGM    Document 31    Filed 05/15/26    Page 7 of 10

stopped striking him once Porter stopped resisting.

### C. The extent of the plaintiff's injury.

Russell, who saw Porter immediately after the encounter with Scott, saw a small abrasion on Porter's hand and no other injuries. And while Porter alleges that he had a swollen temple, bruised jaw, and bruised face, *see* Compl. § V, he did not verify his Complaint or respond to Scott's motion for summary judgment. Thus, Scott's evidence that Porter only suffered an abrasion to his hand is uncontested. And the EMT who evaluated Porter minutes after the incident neither recommended treatment nor referral to a hospital.

### D. The severity of the security problem at issue.

The uncontroverted facts evince the serious security problem Porter created. He struck Scott, the only detention officer in that dorm at the time. And Scott could not leave because the exit door would not open while Porter remained close to it. "[C]orrections officers . . . are entitled to use appropriate force to maintain or restore discipline." *Brooks v. Johnson*, 924 F.3d 104, 110-11, 113 (4th Cir. 2019) (internal quotation and citation omitted). "[W]e owe officers wide-ranging deference in their determinations that force is required to induce compliance with policies important to institutional

security." *Id.* at 113 (internal quotation omitted).

### E. The threat reasonably perceived by the officer.

Related, the uncontroverted facts support Scott's reasonable perception of a threat. He was in 8 South where detainees were housed away from the general population. He was the sole officer in that dorm at the time. And Porter's restraints did not stop his assaultive conduct or continued resistance. *Cf. McKelvey v. W. Reg'l Jail*, No. 3:13-cv-22206, 2016 WL 11483647, at *16 (S.D.W. Va. Jan. 6, 2016), *adopted*, 2016 WL 1090619 (Mar. 21, 2016) (listing cases where an officer's use of force was excessive where the detainee was restrained *and posed little possibility of danger to the officer*). A reasonable officer in Scott's place would have acted accordingly.

### F. Qualified Immunity.

Scott also argues, in the alternative, that he is entitled to qualified immunity. Mem. in Supp. at 12. "The doctrine of qualified immunity 'balances two important interests,' namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform their duties responsibly from 'harassment, distraction, and liability.'" *Byers v. Painter*, 173 F.4th 155, 160 (4th Cir. 2026) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Scott is "entitled to qualified immunity if he

showed either: (1) that the alleged constitutional violation did not occur, or (2) that any such violation was not 'clearly established' at the time the incident occurred." *Id.* (citing *Aleman v. City of Charlotte*, 80 F.4th 264, 284-85 (4th Cir. 2023)).

Scott argues that, assuming *arguendo* that he violated Porter's right to be free from the use of excessive force, "the state of the law is unclear insofar as to whether [Scott] violated a clearly established right." Mem. in Supp. at 14. Scott distinguishes the facts here from those in *Anderson v. Beeman*, No. 21-0683-BAH, 2024 WL 5008052, at *12-13 (D. Md. Dec. 6, 2024), where correctional officers were not entitled to summary judgment on qualified immunity. And, indeed, the facts here are distinguishable from those in *Anderson*, but the analysis for qualified immunity does not end there.

Scott contends that "the state of the law is unclear as to whether [he] violated a clearly established right," Mem. in Supp. at 14, but he does not define the right at issue except to say that Porter has a right to be free from excessive force, *id.* at 13. That right, however, is clearly established.

The court is required to define the right at a "'high level of particularity.'" *Atkinson v. Godfrey*, 100 F.4th 498, 505 (4th Cir. 2024) (quoting *Ewards v. City of Goldsboro*, 178 F.3d 231, 250-51 (4th Cir. 1999)). Here, the right would be the right of a pre-trial

detainee in handcuffs, who strikes a lone detention officer in segregated housing and resists and fights the officer, to be free from the officer's strikes. *See id.* at 506 (explaining that "the clearly established right must be viewed with reference to the particular facts of the case").

Having defined that right, "the key inquiry is whether 'the law provided "fair warning" that [Scott's] conduct was unconstitutional.'" *Id.* (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)). On August 17, 2022, the law was clearly established that a correctional officer could not strike a pre-trial detainee in handcuffs who posed *no risk* to the officer and *was not* actively resisting the officer. The law was clearly established that a correctional officer was allowed to use force to maintain or restore discipline. But the law was not sufficiently clear to put Scott on notice that it was unlawful for him to use force to strike a pre-trial detainee in handcuffs who had struck Scott first, refused to cooperate, and continued resisting and fighting, all while Scott was the only detention officer in the dorm of a housing unit with segregated detainees. Therefore, even assuming Scott violated Porter's right, that right was not clearly established on August 17, 2022. Scott is entitled to qualified immunity.

Considering Scott's facts as uncontested because of Porter's failure to respond to Scott's motion, Scott is entitled to summary judgment.

9

## V.    CONCLUSION

**IT IS HEREBY RECOMMENDED** that the Court **GRANT** Alfred Alonzo Scott, Jr.'s Motion for Summary Judgment and dismiss the case with prejudice.

_JoAnna Gibson McFadden_
JoAnna Gibson McFadden
United States Magistrate Judge

May 15, 2026

10